UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR FIRST NBC BANK | CIVIL ACTION |
| VERSUS | NO. 19-12561 |
| DANIEL BELCHER | SECTION "A" (5) |

## ORDER AND REASONS

Before the Court is a **Motion to Stay Order on Motion for Summary Enforcement of Administrative Subpoena (Rec. Doc. 68)** filed by the Defendant Daniel Belcher. The Plaintiff Federal Deposit Insurance Company ("FDIC") opposes this motion. (Rec. Doc. 76). This motion, set for submission on January 8, 2020, is before the Court on the briefs without oral argument.

### I. BACKGROUND

First NBC Bank Holding Company ("Holding Company") employed the public accounting firm Ernst & Young LLP ("EY") to perform audits over its issued financial statements. (Rec. Doc. 23-23, p. 3, Belcher's Opposition to the FDIC's Subpoena). Each opinion made by EY was made with respect to the Holding Company and was included in the Holding Company's yearly required 10-K. *Id*. However, the Holding Company's only significant asset was First NBC Bank ("Bank"). (Rec. Doc. 49, p. 2, FDIC's Response Memorandum). Thus, EY's annual audit was performed on a consolidated basis and included the financial statements of both the Holding Company and the Bank. *Id*.

During the Bank's financial distress, the Public Company Accounting Oversight Board ("PCAOB") initiated a confidential investigation relating to EY's audits of the Holding Company and the Bank between 2013 and 2015. (Rec. Doc. 23-27, Letter from EY). In connection with this investigation, EY produced thousands of pages of documents to the PCAOB, including

audit workpapers, emails, proprietary firm guidance and methodology, personnel files and reviews, firm audit quality review documents, and other documents. (Rec. Doc. 23-23, p. 6, Belcher's Opposition to the FDIC's Subpoena). Further, eight EY auditors provided a combined 28 days of testimony to the PCAOB, generating over 62,000 transcript pages and using 390 exhibits. *Id*.

Then, in May of 2017, the Holding Company declared bankruptcy, and the Louisiana Office of Financial Institutions closed the Bank and appointed the FDIC as its receiver. (Rec. Doc. 5-5, p. 2, FDIC's Memorandum in Support). The FDIC subsequently issued an Order of Investigation authorizing a probe into the work performed by EY, and the FDIC began requesting documents from the PCAOB. *Id*. at 3. After the PCAOB's Board of Directors received this request, the PCAOB's Board authorized the disclosure of particular records to the FDIC, which included deposition transcripts and other documents that it had received from EY. (Rec. Doc. 49, p. 4, FDIC's Response Memorandum). However, the PCAOB never notified EY that it made these disclosures to the FDIC. (Rec. Doc. 23-23, p. 6-7, Belcher's Opposition to the FDIC's Subpoena).

As the FDIC's investigation developed, it subsequently issued subpoenas for six administrative depositions of current and former EY personnel. (Rec. Doc. 5-5, p. 3, FDIC's Memorandum in Support). Of the six scheduled depositions, the FDIC scheduled Mr. Belcher's first. *Id*. However, three days before his deposition, Mr. Belcher notified the FDIC that he would not be attending the deposition because the PCAOB had improperly shared classified EY documents and testimony with the FDIC. *Id*. Thus, the FDIC filed a Motion for Summary Enforcement of Subpoena (Rec. Doc. 5) to compel Mr. Belcher's deposition.

Upon reviewing the FDIC's Motion, the Court granted the Motion for Summary Enforcement and instructed Mr. Belcher "to appear promptly for an administrative deposition." (Rec. Doc. 65, p. 11, Court's Order and Reasons). Instead of complying with this Order, Mr.

Belcher requested this Court to stay its Order while the Fifth Circuit "considers the significant questions of statutory interpretation and privilege at issue." (Rec. Doc. 68-3, p. 11, Belcher's Memorandum in Support). The Court will now address the merits of Belcher's Motion to Stay.

## II. LEGAL STANDARD

"A stay pending appeal 'simply suspends judicial alteration of the status quo.'" *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014) (citing *Nken v. Holder,* 556 U.S. 418, 429 (2009)). A stay may be automatic or discretionary. If the merits of the case before the district court are directly involved in the merits of an appeal, the district court's proceedings must be stayed. *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982) (per curiam). When an automatic stay is not required by an appeal, the district court may nevertheless grant a discretionary stay of the proceedings. *See Weingarten Realty Investors v. Miller*, 661 F.3d 904, 908 (5th Cir. 2011). While a district court is granted discretion in its decision on whether to grant a stay when a stay is not required, "the exercise of that discretion is not unbridled." *In re First South Sav. Ass'n*, 820 F.2d 700, 709 (5th Cir. 1987). "[R]ather, the court must exercise its discretion in light of what this court has recognized as the four criteria for a stay pending appeal." *Id*. Those four traditional factors include: "(1) whether a stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Weingarten Realty Investors*, 661 F.3d at 910. Notably, the Supreme Court has held that the "first two factors of the traditional standard are the most critical." *Veasey*, 769 F.3d at 892 (citing *Nken*, 556 U.S. at 434). Accordingly, there is a "widely held view that a stay can never be granted unless the movant has shown that success on appeal is probable." *Ruiz v. Estelle (Ruiz I)*, 650 F.2d 555, 565 (5th Cir. 1981).

There is, however, an exception where the heavy burden of the first factor is not required. Under this exception to the traditional rule, when a court is "confronted with a case in which the other three factors strongly favor interim relief," the court may lessen the burden of the first factor from a strong showing of succeeding on the merits, to a substantial case on the merits. *Ruiz*, 650 F.2d at 565 (citing *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977). Thus, when the three remaining factors strongly favor interim relief and the exception applies, "the movant need only present a *substantial* case on the merits when a serious legal question is involved and show that the balance of equities weighs heavily in favor of granting a stay." *Ruiz*, 650 F.2d at 565 (emphasis added) (citing *Providence Journal v. Federal Bureau of Investigation*, 595 F.2d 889 (1st Cir. 1979); *U.S. v. Baylor University Medical Center*, 711 F.2d 38 (5th Cir. 1983); *see also In re Deepwater Horizon*, 732 F.3d 326, 345 (5th Cir. 2013) (citing *Weingarten Realty Investors*, 661 F.3d at 910) (stating "where there is a serious legal question involved and the balance of equities heavily favors a stay . . . the movant only needs to present a substantial case on the merits.")). If the moving party cannot demonstrate this, then it must "make a more substantial showing of likelihood of success on the merits in order to obtain a stay pending appeal." *Id*.

Whether the analysis falls under the traditional approach or the exception, the movant bears the burden of showing that a stay is warranted. *Weingarten Realty Investors*, 661 F.3d at 910. Where "there is even a fair possibility that the stay . . . will work damage to someone else," the party seeking a stay "must make out a clear case of hardship or inequity in being required to go forward." *Landis*, 299 U.S. at 255; *see Ind. State Police Pension Tr. v. Chrysler LLC*, 556 U.S. 960, 961 (2009) (citation omitted) ("'[A] stay is not a matter of right, even if irreparable injury might result otherwise.' It is instead an exercise of judicial discretion, and

the 'party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion.'").

III. **DISCUSSION**

a. **"Strong Showing of Succeeding on the Merits" Test**

Determining what constitutes a "likelihood of success," is no easy task. As the Second Circuit has stated, "[a]lthough courts have discussed and applied these four criteria on numerous occasions, some uncertainty has developed as to the first factor because of the various formulations used to describe the degree of likelihood of success that must be shown." *Mohammed v. Reno*, 309 F.3d 95, 100 (2d Cir. 2002). While the analysis "somewhat resembles the test applied in the district court when evaluating a request for a preliminary injunction, [ ] the differences in posture mean that the two tests are not identical." *See* FEDERAL PRACTICE AND PROCEDURE § 3954 (citing *National Treasury Employees Union v. Von Raab*, 808 F.2d 1057 (5th Cir. 1987)). Thus, it is apparent that the circuits have, to a large degree, chosen to engage in an ad-hoc decision-making process, rather than a formulaic analysis when it comes to the first factor. However, according to the Supreme Court, a sufficient demonstration of a likelihood of success on the merits "requires more than a mere possibility that relief will be granted. *Nken*, 556 U.S. at 418. Even more specifically, when determining the likelihood of a movant's success, the Fifth Circuit has explicitly considered the length and care in the district court's opinion on the issue on appeal to indicate a higher likelihood of success. *See Wildmon v. Berwick Universal Pictures*, 983 F.2d 21, 24 (5th Cir. 1992) ("A reading of the district court's careful and lengthy opinion is all that is needed to support our conclusion on that factor.").

In his Memorandum in Support, Belcher argues that "he not only presents a 'substantial case on the merits,' but in fact makes a 'strong showing that he is likely to succeed.'" (Rec. Doc. 68-3, p. 5, Belcher's Memorandum in Support) (internal citations

Page **5** of **14**

omitted). The Bank, as an FDIC insured and regulated institution, was required to have an annual audit report on its financial statements and internal controls, and that audit report was required to be filed with the FDIC. *See* 12 U.S.C. § 1831m(a), (d); 12 C.F.R. §§ 363.1(b), 363.2(a)-(b), 363.4(a). Part 363.1(b) specifically governs "compliance by subsidiaries of holding companies" and provides that a holding company's financial statements satisfy a bank's regulatory requirements under the FDIC Improvement Act. 12 C.F.R. § 363.1(b). As a result, the Bank[1] filed EY's audit reports on the Holding Company with the FDIC to satisfy § 1831(m) and Part 363. *See* (Rec. Doc. 44-7, Ex. A, Ex. 2) (evidencing the Bank's submission of the EY audit report and audited financial statements to the FDIC for the 2014 fiscal year.). This EY audit report was done on a ***consolidated*** basis and included the financials of both the Holding Company ***and*** the Bank.[2] Thus, while EY's consolidated audit report on the Holding Company and the Bank was submitted to the Federal Reserve through Form Y-9C, this report was also submitted by the Bank to the FDIC through a Part 363 Annual Report. Accordingly, this Court originally ruled that EY's consolidated report was still "***for***" the FDIC, as well as the Federal Reserve, under 15 U.S.C. § 7215(b)(5)(B)(ii)(II).[3] (Rec. Doc. 65, p. 11, Court's Order and Reasons).

---

[1] Although Belcher rightly notes that the Court's Order incorrectly states that "the *Holding Company* filed EY's audit reports with the FDIC" instead of saying that the "*Bank* filed EY's audit reports with the FDIC," this does not change the Court's ultimate conclusions. (Rec. Doc. 68-3, p.7 n.3, Belcher's Memorandum in Support); (Rec. Doc. 65, p. 6, Court's Order). EY's audit report was still for the Holding Company and the Bank.

[2] "The accompanying consolidated financial statements include the accounts of the [First NBC Bank Holding] Company and First NBC Bank, and First NBC Bank's wholly owned subsidiaries[.]" (Rec. Doc. 5-2, p. 65, The Holding Company's 10-k).

[3] Under the PCAOB's discretion, the PCAOB may disclose any confidential records it received to: "the appropriate Federal functional regulator (as defined [by 15 U.S.C. § 6809]) . . . with respect to an audit report ***for*** an institution subject to the jurisdiction of such regulator[.]" 15 U.S.C. § 7215(b)(5)(B)(ii)(II) (emphasis added). Further, 15 U.S.C. § 6809(2) labels the "Board of Directors of the Federal Deposit Insurance Corporation" as one of six "Federal functional regulators."

In his motion, Belcher argues that he makes a "strong showing that he is likely to succeed" on the merits of this case by presenting a simple two step argument. (Rec. Doc. 68-3, p. 6, Belcher's Memorandum in Support). First, "EY only ever conducted audits with respect to the [Holding Company]." *Id*. This is evidenced by the fact that EY's engagement agreement was only with "the Audit Committee of First NBC Bank Holding Company." *Id*. Although the Holding Company's "main asset was the Bank, and that [the Holding Company's] consolidated financial statements as to which EY expressed an audit opinion therefore reflected financial information from the Bank, [this fact does] not thereby transform EY's audit into an audit of the Bank." *Id*. n.2. "It remains the case that EY was only ever engaged by [the Holding Company]." *Id*. "And the audit report itself expressly addressed only 'First NBC Bank Holding Company.'" *Id*. Thus, Belcher concludes that EY's audit report can only be considered "*for*" the Holding Company under 15 U.S.C. § 7215(b)(5)(B)(ii)(II).[4]

Second, Belcher contends that the Federal Reserve was the only appropriate "Federal functional regulator" under 15 U.S.C. § 7215(b)(5)(B)(ii)(II). Although the Bank's financials were required to be submitted to the FDIC under 12 C.F.R. § 363.2(a), the Holding Company's financials were not. *Id*. at 6. "Rather, [12 C.F.R. § 363.1(b)] provides that an insured depository institution that is a subsidiary of a holding company '*may*' submit that holding company's audited financials in order to satisfy its reporting requirements." *Id*. "This regulation merely provides an *optional* avenue by which subsidiary banks can fulfill their own financial reporting requirements to the FDIC by utilizing the holding company's audited financials." *Id*. at 6-7. "But those financials are still the *holding company's* financials – and the

---

[4] 15 U.S.C. § 7215 states that, under the PCAOB's discretion, the PCAOB may disclose any confidential records it received to: "the appropriate **Federal functional regulator** (as defined [by 15 U.S.C. § 6809]) . . . with respect to an audit report ***for*** an institution **subject to the jurisdiction of such regulator**[.]" § 7215(b)(5)(B)(ii)(II) (emphasis added). Further, 15 U.S.C. § 6809(2) labels the "Board of Directors of the Federal Deposit Insurance Corporation" as one of six "Federal functional regulators."

audit opinion is still with respect to the *holding company*." *Id*. at 7. Thus, Belcher concludes that the regulator of the Holding Company, the Federal Reserve, is the only appropriate "Federal functional regulator" under 15 U.S.C. § 7215(b)(5)(B)(ii)(II).

Although the Court appreciates the thoughtfulness of Belcher's argument, the Court still remains unconvinced by his interpretation of 15 U.S.C. § 7215(b)(5)(B)(ii)(II). First, Belcher's interpretation of the word "for" in § 7215(b)(5)(B)(ii)(II) is too restrictive. Although the Court recognizes that EY contracted **only** with the Holding Company and addressed its report **only** to the Holding Company's Board of Directors, one cannot thereby conclude that EY's report was only for the Holding Company within the meaning of § 7215(b)(5)(B)(ii)(II). (Rec. Doc. 22-1, Exs. 1-3, EY's Engagement Agreement); (Rec. Doc. 49-3, p. 10, EY's Report of Independent Accountants). In other words, while one could consider EY's audit reports superficially only "for" the Holding Company, it is disingenuous to say that these reports, ***in substance***, were not "for" the Holding Company ***and*** the Bank. As EY notes in its audit report:

> Because management's assessment ***and our audit were conducted to meet the reporting requirements of Section 112 of the Federal Deposit Insurance Corporation Improvement Act (FDICIA)***, our audit of First NBC Bank Holding Company's internal control over financial reporting included control over the preparation of financial statements in accordance with U.S. generally accepted accounting principles and with the instructions to the Form Y-9C.[5]

Additionally:

> We have also audited, in accordance with auditing standards generally accepted in the United States, the ***consolidated balance sheets*** of First NBC Bank Holding Company as of December 31, 2014 and 2013 and the related ***consolidated*** statements of income and comprehensive income changes to stockholders' equity and cash flows for each of the three years in the period ended December 31, 2014 and our report dated March 31, 2015 ***expressed an unmodified opinion thereon***.[6]

---

[5] (Rec. Doc. 49-3, p. 10, EY's Audit Report) (emphasis added).
[6] *Id*. at 11 (emphasis added).

Lastly:

> The accompanying *consolidated* financial statements include the accounts of the [Holding] Company *and* First NBC Bank[.]"

Thus, because EY issued an opinion on the Holding Company's consolidated financials, this audit report therefore expresses an opinion on *both* the Holding Company's financial statements *and* the Bank's financial statements. Although Belcher says in his Motion that "[a]s the report makes clear, EY still *only* expressed an opinion on [the Holding Company's] financial statements and internal controls," this appears questionable because EY had to perform audit procedures and tests on the Bank's account balances to express an opinion on the consolidated financials of both the Holding Company and the Bank. (Rec. Doc. 86, p. 4 n.1, Belcher's Reply)

Further, as the plain wording of EY's report shows, the report was completed to satisfy the Federal Reserve's filing requirements, through Form FR Y-9C; but, and more importantly here, this report was also completed to satisfy the Bank's annual filing requirements with the FDIC under 12 C.F.R. §§ 363.2(a). As Belcher continuously reiterated, "[12 C.F.R. §§ 363.1(b) provides than an insured depository institution that is a subsidiary of a holding company '*may*' submit the holding company's audited financials in order to satisfy its reporting requirements." (Rec. Doc. 68-3, p. 6, Belcher's Memorandum in Support). Thus, when the Bank submitted EY's audit report on the consolidated financial statements of both the Holding Company and the bank to the FDIC, this audit report effectively became "*for*" the Bank under 15 U.S.C. § 7215(b)(5)(B)(ii)(II). Accordingly, because EY's audit report was "for" the bank, the FDIC was also the "appropriate Federal functional regulator" under 15 U.S.C. § 7215(b)(5)(B)(ii)(II).

As a result of this determination, the Court additionally finds that Belcher cannot present a strong showing that he is likely to succeed on the merits.

### b. "Substantial Case on the Merits" Test

Although Belcher cannot show that he is likely to succeed on the merits, the Court agrees with Belcher that the less stringent "substantial case" standard should be applied here. (Rec. Doc. 68-3, p. 4, Belcher's Memorandum in Support). More specifically, "[t]he Fifth Circuit recognizes that a party presents a substantial case on the merits when there is a lack of precedent to clarify the issues at bar." *Cruson v. Jackson Nat'l Life Ins. Co.*, No. 4:16-CV-00912, 2018 WL 2937471, at *4 (E.D. Tex. June 12, 2018) (finding a substantial case on the merits when the issue was novel, serious, and there was a significant lack of precedent). For example, in *Ruiz*, the Fifth Circuit looked to case law to find a constitutional mandate for the disputed legal issue. 650 F.2d at 568. The Fifth Circuit there found that there was no "constitutionally mandated square footage requirement" for prison cells based on its reading of *Rhodes v. Chapman*, 452 U.S. 337, 337 (1981), *Newman v. Alabama*, 559 F.2d 283, 288 (5th Cir. 1977), and *William v. Edwards*, 547 F.2d 1206, 1215 (5th Cir. 1977). *Id*. at 568. The Fifth Circuit subsequently found that "we know of no constitutional mandate for correctional units to be situated within 50 miles of a major metropolitan area in order to ensure adequate staffing." *Id*. at 574. "Therefore, we conclude that the State has made a substantial case on the merits[.]" *Id*.

Here, Belcher was correct when he noted that "the Court issued a first-of-its-kind opinion [in this case] on a key issue of statutory interpretation." *Id*. The Court could not find any case law or other relevant precedent to provide guidance on how to apply this particular provision. Thus, the Court finds that Belcher's case satisfies the "substantial case" test. As a result, Belcher need now only show that (1) this matter involves a serious legal question and (2) that the balance of equities (*i.e.*, the other three remaining factors) weighs heavily in favor of granting a stay.

### c. Whether This Matter Involves a Serious Legal Question

A serious legal question is one that could have a broad impact on federal and state relations, or an otherwise far-reaching effect of public concern. *Wildmon*, 983 F.2d at 23-24 (citing *Baylor*, 711 F.2d at 40). For example, the Fifth Circuit determined in *Baylor* that "the serious legal question involved was whether Medicare and Medicaid payments constitute federal financial assistance within the meaning of the Rehabilitation Act because 'that could have a broad impact on federal/state relations' which could open 'the doors of private institutions to the probing tools of an HHS investigation.'" *Id*. (quoting *Baylor*, 711 F.2d at 40).

Belcher argued that this case involves a "serious legal question" by saying "[g]iven the significance of this opinion to accountants and accounting firms around the country, operating under the understanding that materials submitted to the PCAOB are 'confidential and privileged,' . . . there can be no genuine dispute that the legal questions here are 'serious.'" (Rec. Doc. 68-3, p. 4-5, Belcher's Memorandum in Support). However, the FDIC countered by saying "Belcher characterizes the Court's order as raising 'serious' legal issues on the theory that the issues have broader significance to the accounting industry." (Rec. Doc. 76-2, p. 7, FDIC's Memorandum in Support). "But in reality[,] the Court's order is a straightforward application of a statute that allows the PCAOB to share information with multiple federal agencies under various circumstances." *Id*.

Here, the Court finds that the seriousness of this case does not rise to the level necessitated by this factor. Although this case decides an important aspect of law for accounting firms, this case does not have the far-reaching effects and public concerns that is required by *Baylor*. While this determination ends the determination of whether Belcher is entitled to stay the proceedings, the Court will proceed, *in arguendo*, to the balance of equities factor.

### d. The Balance of Equities

A determination of the balance of equities, "*i.e.* consideration of the other three factors," is critically relevant to the court's determination. *Ruiz I*, 650 F.2d at 565–66. If a court finds that this balance "is not heavily tilted in the movant's favor, the movant must then make a more substantial showing of likelihood of success on the merits." *Id*. (emphasis added). Each of the three factors is addressed below.

#### i. Factor One – Belcher's Irreparable Injury

For this factor, the Court analyzes whether the applicant will be irreparably injured absent a stay. The Court defines this type of injury as one for which a monetary award cannot serve as adequate compensation. To satisfy this factor, the moving party must show more than just a possibility of irreparable injury. *See Nken*, 556 U.S. at 418. Further, when there is not a substantial likelihood of success on appeal, the importance of this factor is significantly reduced. *See Arnold v. Garlock, Inc.*, 278 F.3d 426, 441 (5th Cir. 2001).

Here, the Court agrees with Belcher that he will experience some irreparable harm if a stay is not granted. For instance, in *Maness v. Meyers*, the Supreme Court "recognized that '[w]hen a court during trial orders a witness to reveal information . . . [c]ompliance could cause irreparable injury because appellate courts cannot always "unring the bell" once the information has been released.'" *In re Grand Jury Proceedings*, 601 F.2d 162, 169 (5th Cir. 1979) (alterations in original) (quoting *Maness v. Meyers*, 419 U.S. 449, 460 (1975). As Belcher notes in his Memorandum in Support, "if [Belcher's] deposition goes forward, [Belcher] will be required to answer questions based on – if not also explicitly reflecting – information from the PCAOB-privileged materials, resulting in further breaches of his statutory privilege." (Rec. Doc. 68-3, p. 8, Belcher's Memorandum in Support). Although the Court agrees with Belcher that this factor weighs in favor of granting a stay, the Court also notes

that the significance of this factor is greatly reduced because there is no substantial likelihood of Belcher being successful on appeal. *See Arnold*, 278 F.3d at 441.

ii. **Factor Two – FDIC's Irreparable Injury**

Next, this second factor looks at whether a stay "will cause [non-movants] difficulties in presenting [their] case." *Weingarten*, 661 F.3d at 913. Here, the applicable statute of limitations requires that the FDIC complete its investigation and file any complaint related to EY's audits by April 2020. (Rec. Doc. 76-2, p. 1, FDIC's Memorandum in Support). As the FDIC points out, "[g]iven the time required for an appeal and the deadline posed by the statute of limitations, a stay is effectively a reversal of the Court's order because no depositions could occur within the limitations period." *Id*. at 8. Here, the Court agrees with the FDIC that a stay will substantially jeopardize its ability to conduct any administrative depositions of Belcher or the other remaining EY auditors. Thus, the Court finds that this factor weighs in favor of not granting a stay.

iii. **Factor Three – Public's Interest**

Lastly, for the third factor, there is a "general public policy of preserving judicial resources from the risk of reversal," especially where a difficult question is presented on appeal; but where the movant fails to present a likelihood of success on the merits, there is "little reason to invoke" this policy interest. *Weingarten*, 661 F.3d at 913. Here, because the FDIC is a governmental agency, "its interest and harm merges with that of the public." *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013). As the FDIC notes, "Congress had directed the FDIC as receiver to investigate misconduct that caused harm to failed institutions." (Rec. Doc. 76-2, p. 11, FDIC's Memorandum in Support). "A stay that interferes with the FDIC's collection of information relevant to its investigation accordingly harms both the FDIC and the public. *Id*.; *see Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008) ("there is inherent harm to an agency in

preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop and enforce."). Thus, the Court agrees with the FDIC and finds that this factor also weighs in favor of not granting a stay.

Upon conducting the three-factor balancing test, the Court is particularly swayed by *Humphries v. OneBeacon Am. Ins. Co.,* No. CIV.A. 13-5426, 2014 WL 1330034, at *2 (E.D. La. Apr. 2, 2014). There, the court found that the moving party would experience irreparable harm if a stay was not granted. *Id*. However, the court also recognized that the non-moving party would be substantially injured if a stay was granted. *Id*. Ultimately, because the moving party did not have a substantial likelihood of success on appeal, the court found that the non-movant's potential injury greatly outweighed the movant's potential injury. *Id*. at *3. Thus, the court denied the stay. *Id*.

Similar to *Humphries*, the balance of equities here does not weigh in favor of granting a stay. Because Belcher does not have a substantial likelihood of success on appeal, the potential harm to the FDIC and the public greatly outweigh the potential harm to Belcher. Therefore, the Court concludes that this matter shall not be stayed. This final determination is bolstered by the fact that this matter does not rise to the required level of seriousness required by the Fifth Circuit in *Wildmon* and *Baylor*.

Accordingly;

**IT IS ORDERED** that the **Motion to Stay (Rec. Doc. 68)** filed by the Defendant Daniel Belcher is **DENIED**. Mr. Belcher is to appear for an administrative deposition with the FDIC on the day that the parties agreed to, January 28, 2020. (Rec. Doc. 76-3).

January 15, 2020

JUDGE JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE